### UNITED STATES v. LEE KEE et al.

#### (Circuit Court of Appeals, Ninth Circuit. May 5, 1902.)

#### No. 776.

1. CHINESE—DEPORTATION.

Chinamen arrested just after crossing into the United States from British Columbia should be deported to China under Act May 5, 1892, § 2 (27 Stat. 25), there being no evidence that they were citizens of or subjects of British Columbia, but merely that they had lived there between one and a half and three years, and had property there, and no trick being played on them in the matter of their arrest, further than that the person who drove them to the boundary line disclosed to the officers the nature of the work he was engaged in.

Appeal from the District Court of the United States for the Northern Division of the District of Washington.

Wilson R. Gay and Edward E. Cushman, for the United States.

Humes, Miller & Lysons, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge

GILBERT, Circuit Judge. This appeal is taken from an order and judgment of the district court for the district of Washington modifying the commissioner's order of deportation of the appellees to China, and directing that they be deported and returned to British Columbia, the country whence they came. The testimony, which was all taken before a commissioner, shows that on the morning of July 3, 1901, shortly after midnight, Albert Whyte arrested the appellees and two other Chinamen at a point about 60 yards south of the line between the state of Washington and British Columbia. The only witnesses in the case were the two appellees and the said Albert Whyte, and one W. T. Cooksley, who was an immigration officer of British Columbia. The facts as shown by the evidence of Whyte and Cooksley are that the former, who was the United States immigration inspector stationed at Vancouver with special oversight over the boundary line, had been for some weeks in the vicinity of the point where the arrest was made, owing to the fact that Chinamen were frequently passing the line. On July 1st he went to Vancouver to make out his monthly report, and on the next day, in consequence of a telephonic message from Ladner, B. C., he went to that place, and that night procured a conveyance to drive to the boundary line, which lay six miles south of Ladner. He

communicated with Cooksley, and gave him certain instructions.    On his way to the boundary line he met a double team with a white driver, returning to Ladner, and learned from the driver that the latter had taken five Chinamen from Ladner to the boundary line, and had left them on the British Columbia side of the line, and that they had crossed over.    Whyte had understood that ten Chinamen were to start that night from Ladner.    He went on until he met Cooksley at the crossroads known as O'Brien's Corners, about a mile and a half north of the line.    He instructed Cooksley to remain at the crossroads, and to fire a shot as a signal if the next load of Chinamen did not take the direct road toward the boundary line from the crossroads.    Whyte proceeded across the boundary line, and took his station a short distance south thereof.    Cooksley and his assistant waited at the crossroads until the same white driver whom Whyte had met came along from Ladner with a wagon containing four Chinamen, and passed the crossroads, and went on toward the boundary line.    Cooksley followed them, driving in his buggy, at a distance of about 100 yards behind them, and saw the wagon stop near the line, and the Chinamen get out, and proceed to walk down the road across the line.    When they reached the point where Whyte was they were taken under arrest. The officers, explained why the wagon stopped before the line.    It was that the driver feared he would render his wagon and team subject to seizure if he crossed the line with his load.

The testimony of the appellees is that they had been at work for 10 or 15 days on a farm in British Columbia, about two miles north of the American line, and that a few days before the arrest they went to a celebration in Vancouver, from which they returned by public conveyance as far as Ladner, where they, together with another Chinaman, who was working on another farm in the vicinity of that on which they worked, hired a conveyance, with a white driver, to take them back to the farm, and that they took the fourth Chinaman into the wagon after they had gone three or four miles.    They stated that the reason why they did not start from Ladner until 10 o'clock at night was that the driver had other work to do and could not go sooner. They testified that while on their way back to the farm where they worked, and at a distance of about two miles from their destination, the driver told them to get down out of the wagon, and that they were there arrested in British Columbia, and that they had no intention of coming into the United States.    They testified that after they were arrested they were taken on toward the American line, and past the farm where they had worked, and that they wished to stop there and call up the boss, but the officers would not allow them to do so.    Here is the point of conflict in the evidence.    The appellees were either arrested where the officers said they were arrested, at a point just south of the boundary line, or, which seems to us extremely improbable, they were unlawfully taken into custody in British Columbia, four miles north of the line, and while they were on their way to their working place.    The judgment of the district court was influenced by his belief, derived from the evidence, "that the teamster whom they employed to carry them on their way played a trick on them, and made them believe they were in arrest, and brought them to the boundary line, instead of

fulfilling his contract by carrying them to their destination." Entertaining, as we do, the highest respect for the opinion of the learned district judge, we have carefully examined the record to find the evidence upon which this conclusion was reached. We are unable to discover anything which, in our opinion, tends to show that the driver played a trick on the appellees or made them believe they were under arrest. He evidently had been engaged to haul two wagon loads of Chinamen to the boundary line that night. He had taken one load, and while returning for the second he met Whyte, and told him what he was doing. If he played any trick on the appellees we think it was only to disclose to the officers the nature of the work he was engaged in. We see nothing to impugn the good faith or honesty of either of the officials who were engaged in making the arrest, or to indicate that they were doing anything to induce the appellees to cross the line, or deceive them, or that the arrest was made for any purpose other than to enforce the law. The appellees were Chinamen, both unable to speak the English language. They testified, the one that he had lived in British Columbia three years, and the other that he had lived there a year and a half. Both claimed to have property there. There was no evidence that they were citizens or subjects of that country, and neither of them made any "claim to be a citizen or subject" thereof. The district court made no finding that they were such citizens or subjects. The commissioner found that they entered the United States from the empire of China. We think, upon the evidence, the appellees should have been deported to China, under section 2 of the act of May 5, 1892 (27 Stat. 25).

The judgment of the district court is reversed, and the cause remanded, with instructions to so order.